[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12621

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MILTON WRENN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 7:18-cr-00058-HL-TQL-1

_____

Before WILLIAM PRYOR, Chief Judge, and WILSON and LUCK, Circuit Judges.

PER CURIAM:

Milton Wrenn appeals his conviction and sentence of 120 months of imprisonment for possessing child pornography, 18 U.S.C. § 2252(a)(4)(B). Wrenn challenges the denial of his motion to suppress the images and videos found on his laptop computer on the grounds that the search warrant was invalid and that the plain-view doctrine did not permit the seizure of his laptop. He also challenges the procedural and substantive reasonableness of his sentence. We affirm.

## I. BACKGROUND

On October 4, 2017, around 5:00 a.m., Deputy Alan Patton of Union County saw an eastbound car make a U-turn across five lanes to head westbound, and he then saw the car make another U-turn to return eastbound. After the car passed over a hash-marked area of the road not intended for travel, Patton initiated a traffic stop for failing to maintain the lane and crossing the fog lines during the U-turns.

As Patton approached the car, he smelled a strong odor of marijuana. Patton identified Wrenn as the driver and asked where the marijuana was located. After Wrenn pulled a glass jar of marijuana from the center console, Paton arrested him for possessing marijuana.

Patton asked if he wanted to call someone to retrieve his car. Wrenn called a friend, who said he was on his way and would be there within 30 minutes. Officers waited two hours for the friend to retrieve Wrenn's car.

When Wrenn's friend failed to show, the officers decided to impound and inventory the vehicle based on the police department's policies. The inventory led to the discovery of digital scales and a trash bag containing about four pounds of raw marijuana. The inventory also revealed electric bills in Wrenn's name for an address in Moultrie, Georgia. The June bill was less than $85, and the July bill was about $400. Lieutenant Darren Osborn told narcotics investigator Jerome Burgess that he believed that the erratic power consumption reflected by the electric bills ordinarily occurred with indoor marijuana grow operations.

On October 12, 2017, Burgess and another officer followed up on an unrelated drug complaint near Wrenn's address and decided to stop by. Burgess parked about 30 yards from the mobile home on Wrenn's property and smelled an overwhelming odor of marijuana coming from the house. Burgess knocked on the front door, but no one answered. A black opaque material covered each window and prevented Burgess from seeing inside the home. Burgess saw that the electric meter was moving rapidly, but he detected no lights or appliances running, including the air conditioning unit. When Burgess called the magistrate about his intent to go to his office to prepare an application for a search warrant, the

magistrate said that he could be there in a few minutes to review the application on-site.

Burgess's handwritten application for a search warrant listed the facts that Wrenn's car contained several pounds of marijuana and irregular electric bills, that Burgess personally smelled an odor of marijuana emanating from the house, and that the electric meter was spinning rapidly, which suggested a large draw on power. The application sought authority to search for "marijuana, marijuana plant material, [and] any and all substances and[/]or compounds containing tetrahydrocannabinol." The magistrate parked behind Burgess's vehicle, reviewed the application, and signed the warrant. The magistrate instructed the officers to wait until after he had left the property to execute the warrant.

During the search, the officers found numerous items in Wrenn's name, including bank statements, prescription pill bottles, and packages. Officers recovered evidence of an indoor marijuana grow operation, including hydroponic watering systems, lighting systems, fertilizers, a vacuum sealer, plastic wrap, suspected juvenile marijuana plants and seeds, glass jars, envelopes, bags containing marijuana, and a marijuana pipe. The officers found a watering filtration system installed where a washer and dryer ordinarily would be located and injection lines running throughout the house into the individual rooms. The officers observed power cables running from the main power panel to all three bedrooms and the living room. And there was a tray of marijuana in the living room as well as a laptop, which was open and powered on to display a

screensaver of a landscape image. The officers seized the laptop and evidence of the grow operation, including 233 marijuana plants.

On November 7, 2017, Burgess applied for and received a warrant to search the laptop for evidence of the grow operation, including "all stored digital images, contacts, customer and or vendor lists, grow charts, harvesting amounts and schedules, search query data, bank transactions and or account information for online vendor transactions . . . . [related to] trafficking in marijuana." A forensic examination of the laptop revealed online searches for "bedding material, fertilizers, [and] the planting media" related to marijuana cultivation, as well as 2,444 images and six videos of child pornography.

A federal grand jury indicted Wrenn for possessing child pornography, 18 U.S.C. § 2252(a)(4)(B). He moved to suppress the evidence found on his laptop. Wrenn argued that Patton lacked reasonable suspicion for the traffic stop and that the officers failed to wait a reasonable time before impounding and conducting an inventory of his car. Wrenn argued that the search warrant was invalid because the magistrate was not neutral and detached. He also argued that the search warrant did not authorize his laptop to be seized and that the incriminating nature of the laptop was not apparent.

At an evidentiary hearing, Patton and Osborn testified about the police department's written impound and inventory policies. Osborn explained that arrested drivers were afforded a reasonable time to have someone retrieve their vehicle from the scene, usually

about 30 to 40 minutes or longer, depending on how busy they were. Osborn testified that waiting for two hours for Wrenn's friend was "more than reasonable" because they were a small department with only four people working that morning. Osborn explained that conducting an inventory was necessary to account for the contents of impounded vehicles and to guard against claims of stolen property.

Burgess testified that he had 32 years of law enforcement experience and eight years of experience investigating narcotics. He had submitted about 100 search warrant applications in his career. He did not believe that he had probable cause to search Wrenn's house until he stepped out of the car and smelled a strong marijuana odor coming from the house. The smell and the electric meter "put [him] over the edge." Burgess recalled that the magistrate commented that he smelled marijuana before he reviewed the search warrant. Burgess also explained that, in his experience as a narcotics investigator, it was common for computers and cell phones to contain evidence of criminal activity, including ledgers, correspondence with buyers, and images of drugs.

Chief Magistrate Judge J.J. McMillan testified that he had held his position in Colquitt County for over 15 years and previously worked for the sheriff's department for over 12 years. McMillan had reviewed search warrants on-site about 40 times, which was normal to do for convenience and had been done by other magistrates when he was an investigator. In this instance, because of how far out the officers were, it was quicker for him to come to

them. McMillan did not approach Wrenn's house but stayed by Burgess's truck. He did not participate in the investigation or search. He did not recall whether he noticed a marijuana odor but explained that smelling marijuana "would have just made [his] belief of probable cause even stronger." McMillan stated that the four corners of the application established probable cause.

The district court denied Wrenn's motion to suppress. The district court ruled that the traffic stop was lawful and the officers complied with the county impound and inventory policy. The district court ruled that the magistrate was neutral and detached from the investigation and search, and the facts listed in the search warrant application established probable cause. The district court ruled that Wrenn's computer was lawfully seized because it was in plain view and the officers had probable cause to believe that it contained additional evidence of a narcotics crime.

Wrenn waived his right to a jury trial and proceeded to a bench trial to preserve the suppression issues for appeal. Wrenn and the government submitted a written stipulation of facts, including that his laptop contained 2,444 images and six videos of child pornography and that he refused to cooperate with law enforcement after his arrest. The government introduced ten exhibits of child pornography obtained from Wrenn's laptop, which depicted infants, toddlers, and prepubescent children being vaginally and anally penetrated and performing oral sex on adult males and other children. The government also presented testimony from a

special agent of the Georgia Bureau of Investigations about her investigation. The district court found Wrenn guilty.

Wrenn's presentence investigation report provided a combined total offense level of 31, a criminal history category of I, and an advisory guideline range of 108 to 135 months of imprisonment, United States Sentencing Guidelines Manual § 2G2.2(a)(1) (Nov. 2021). His offense level included a two-level increase for possessing material involving prepubescent minors, *id.* § 2G2.2(b)(2), a four-level increase for possessing material portraying sadomasochistic conduct and sexual exploitation of infants and toddlers, *id.* § 2G2.2(b)(4), a two-level increase for using a computer, *id.* § 2G2.2(b)(6), and a five-level increase for possessing more than 600 images of child pornography, *id.* § 2G2.2(b)(7). The probation officer rejected Wrenn's request to reduce his offense level for acceptance of responsibility, *id.* § 3E1.1. The report also noted that, while in federal custody, Wrenn developed a benign tumor around his brain and spinal cord, which was surgically removed, reappeared, and surgically removed again.

At sentencing, Wrenn argued that he should receive a reduction for accepting responsibility because he proceeded to trial only after the government refused to offer him a plea conditioned on his right to appeal the suppression issues. The government responded that it had not heard anything resembling acceptance of responsibility from Wrenn, such as an expression of remorse, and stated that the images on Wrenn's computer were "more than disturbing, . . . vile, . . . . [and] some of the worst that the [special agent]

had ever seen." The government acknowledged that the sentencing hearing was not finished, so it would have to wait to "hear what [Wrenn] has to say" about his actions, and the district court reserved ruling on the objection.

Wrenn's sister told the district court that Wrenn had been a "wonderful person" throughout his life and asked for mercy in the light of his health issues. In his allocution, Wrenn asked the district court "to consider that [he had] already done five years of incarceration, and . . . had a lot of medical issues," and he asked to be sentenced to time served to allow him to live with his sons and be driven to medical appointments.

The district court overruled Wrenn's objection. After considering the statutory sentencing factors, 18 U.S.C. § 3553(a), it sentenced Wrenn to 120 months of imprisonment. It explained that a sentence of time served was inappropriate and that his physical condition was not a controlling factor. It ruled that it was "altogether probable, based on his record, that he would continue with his misconduct and continue to break the law in ways similar to those shown in this case."

## II. STANDARD OF REVIEW

Two standards of review govern this appeal. When reviewing a motion to suppress, we review legal conclusions *de novo* and findings of fact for clear error. *United States v. Hollis*, 780 F.3d 1064, 1068 (11th Cir. 2015). We review the reasonableness of a sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007).

## III. DISCUSSION

We divide our discussion in three parts. First, we explain that the district court did not err by denying Wrenn's motion to suppress because probable cause supported the warrant to search his home, a neutral and detached magistrate signed the warrant, and the officer had probable cause to believe that the laptop, which was in plain view, contained evidence of Wrenn's drug crime. Second, we explain that Wrenn's sentence is procedurally and substantively reasonable.

### A. The District Court Did Not Err by Denying Wrenn's Motion to Suppress

Wrenn argues that the district court should have suppressed the seized evidence against him for three reasons. All his arguments fail. We address each in turn.

First, Wrenn argues that the officers failed to comply with the Union County impound and inventory policies, so the electric bills found inside his car were fruit of the illegal inventory and could not be used to establish probable cause to obtain a warrant to search his home. "[I]nventory searches are [] a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). Officers need not obtain a warrant to search an impounded car if they have authority to impound the car and follow standardized department procedures governing inventory searches. *United States v. Cohen*, 38 F.4th 1364, 1371 (11th Cir. 2022). An inventory must be authorized by

"standard criteria" and "on the basis of something other than suspicion of evidence of criminal activity." *Bertine*, 479 U.S. at 375.

The written department policy expressly authorized the officers to impound and inventory Wrenn's car after they made a reasonable but unsuccessful attempt to wait for Wrenn's friend to arrive. The impound policy directed "deputies [to] impound a motor vehicle" in situations such as when "the driver of a motor vehicle has been arrested . . . [and] [t]he driver of a vehicle has made a specific request for the disposition of the vehicle . . . and the deputy has made a *reasonable, but unsuccessful* effort to comply with this request." Wrenn fails to explain how the officers violated the policy after the officers waited *two hours*, much longer than their usual waiting period of 30 to 40 minutes, when only four officers were on duty that morning. Wrenn does not argue that the officers acted in bad faith, so we conclude that the inventory was lawful. *See id.* Insofar as Wrenn asserts that the officers' pre-arrest retrieval of the glass jar of marijuana from the center console was illegal, he has abandoned that argument by raising it only in passing and without supporting authority. *See United States v. Esformes*, 60 F.4th 621, 635 (11th Cir. 2023).

Second, Wrenn argues that the warrant to search his home was invalid because the magistrate who issued it reviewed and signed the warrant on Wrenn's property and might have smelled marijuana. A search warrant must be reviewed by a neutral and detached magistrate who "read[s] the warrant and make[s] his own independent assessment as to whether the warrant and its

underlying affidavit contain a sufficient amount of information to support a finding of probable cause." *United States v. Martin*, 297 F.3d 1308, 1317 (11th Cir. 2002). Neutrality and detachment require severance and disengagement from law enforcement activities. *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972). A judicial officer fails to manifest neutrality and detachment when he "allow[s] himself to become a member, if not the leader, of the search party which was essentially a police operation." *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–27 (1979).

In *Lo-Ji Sales*, the Supreme Court held that, by accompanying officers to a store under an invalid warrant and participating in the search by ordering officers to seize items based on his personal judgment of the obscenity of the items, the judge had "undertook to telescope the processes of the application for a warrant, the issuance of the warrant, and its execution" and was no longer acting as a "neutral and detached" judicial officer but as an adjunct law enforcement officer. *Id.* at 327–28. But the Court was careful not to suggest that a neutral and detached magistrate "loses his character as such merely because he leaves his regular office in order to make himself readily available to law enforcement officers who may wish to seek the issuance of warrants by him." *Id.* at 328 n.6.

The record supports the ruling that a neutral and detached magistrate issued the warrant to search Wrenn's home. The magistrate reviewed the warrant application on-site as a matter of convenience to the officers, who were far out in the county. He stayed at Burgess's truck and did not approach the home or attempt to

investigate the facts contained in the warrant affidavit, such as by personally inspecting the electric meter or walking close to the home to determine whether a marijuana odor was coming from the home. He did not substitute his own judgment for the officers' judgment because Burgess already had written in his affidavit that he smelled marijuana before the magistrate arrived. And the magistrate did not participate in the execution of the warrant, but instead detached himself from the operation by directing the officers to wait to execute the warrant until after he had left the property. *See id.* at 326–28. Moreover, the district court found that the magistrate credibly testified at the suppression hearing that smelling marijuana would not have influenced his determination that the four corners of the warrant affidavit contained probable cause based on Burgess's knowledge of the electric bills, the several pounds of marijuana in Wrenn's car, the rapidly moving electric meter at his home, and Burgess's detection of a strong odor of marijuana emanating from Wrenn's home. *See United States v. Holt*, 777 F.3d 1234, 1255 (11th Cir. 2015).

Third, Wrenn argues that the seizure of his laptop exceeded the scope of the warrant to search his home. He argues that Burgess failed to explain how the laptop could be related to the offense of possessing marijuana. He also contends that the plain-view doctrine is inapplicable because the incriminating nature of the laptop was not readily apparent to the officers. We disagree.

The plain-view doctrine permits the warrantless seizure of an object where an officer is lawfully located in a place from which

the seized object could be plainly viewed and lawfully accessed, and the incriminating character of the object is immediately apparent. *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2009). When an officer has access to an object under a prior justification under the Fourth Amendment, "[t]he seizure of property in plain view involves no invasion of privacy and *is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.*" *Texas v. Brown*, 460 U.S. 730, 741–42 (1983) (alteration in original). "[P]robable cause is a flexible, common-sense standard. . . . merely requir[ing] that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime . . . ." *Id.* at 742 (citation omitted). Police officers may draw this inference based on their own training and experience in deciding whether probable cause exists, and we give "due weight" to a finding of the district court that the officer was credible and his inference was reasonable. *Ornelas v. United States*, 517 U.S. 690, 700 (1996).

The record supports the ruling that the officers lawfully seized Wrenn's laptop, which was in plain view, because they had probable cause to believe that the laptop was associated with the marijuana grow operation. The laptop was powered on in the center of a multi-room marijuana grow operation with 233 marijuana plants. The mobile home was outfitted with an extensive water filtration system connected to the washer and dryer hookups, and power cables ran from the main electrical panel to all of the bedrooms and the living room. All the correspondence and

prescription bottles in the home were in Wrenn's name. The only operable electronic device in the home was the laptop. Burgess, who had 32 years of law enforcement experience and eight years of experience investigating narcotics, testified that he seized the laptop because, based on his experience, it was common for criminals involved in illicit drug operations to keep on their phones or computers ledgers, correspondence, and images regarding the drugs they sold and the people to whom they sold their drugs. In the light of the extensive grow operation Burgess found in Wrenn's home, it was reasonable for him to conclude that the laptop in the center of the operation contained evidence of Wrenn's drug crime. *See id.*

Although Burgess seized the laptop during the home search, he did not search the laptop until he received a warrant to do so. His application to search the laptop explained that, in his experience as a narcotics investigator, subjects involved in illicit drug activities often keep records and images of their activities on electric storage devices, as well as contact information for vendors and customers. The facts that supported probable cause for the warrant to search Wrenn's laptop were materially the same facts that supported probable cause to search his home and to seize his laptop in the first place. The district court did not err by denying Wrenn's motion to suppress the laptop evidence.

### B. Wrenn's Sentence is Procedurally and Substantively Reasonable

Wrenn argues that the district court procedurally erred by denying a reduction for acceptance of responsibility, U.S.S.G.

§ 3E1.1, because he proceeded to a bench trial instead of pleading guilty only to preserve the suppression issues for appeal.

Section 3E1.1(a) instructs the district court to reduce the offense level by two levels "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The guideline does not define what constitutes "acceptance of responsibility," much less state that a defendant's willingness to plead guilty or stipulate to facts regarding his guilt is sufficient to receive the reduction. *See id.* Although Wrenn is correct that a defendant is not precluded from receiving the reduction when he proceeds to trial to assert and preserve issues that do not relate to factual guilt, *see id.* § 3E1.1 cmt. n.2, "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct," *id.* Indeed, as we have explained, remorse is a critical component of accepting responsibility, and the district court may consider the defendant's conduct before, during, and after trial, including his allocution during sentencing, to ascertain whether his actions and statements reflect remorse. *See United States v. Stanley*, 739 F.3d 633, 652 (11th Cir. 2014).

Wrenn failed to meet his burden of proving that he accepted responsibility for his crime. Setting aside his refusal to cooperate with law enforcement and his decisions to exercise his rights to trial and not to testify, Wrenn's conduct established a lack of accountability. At sentencing, the government argued that Wrenn made no expression of remorse despite his offense conduct involving images and videos that were "more than disturbing, . . . vile, . . . . [and]

some of the worst that the [special agent] had ever seen." Even after the government acknowledged that the "hearing [was] not over yet, so [it would] wait to hear what [Wrenn] has to say," and after the district court reserved its ruling until after Wrenn allocuted, Wrenn declined the invitation to take accountability for his conduct and instead chose to ask for a sentence of time served, talked about his health issues, and stated that he wanted to live with and be taken care of by his sons. The district court enjoyed a "unique position to evaluate [Wrenn's] acceptance of responsibility," U.S.S.G. § 3E1.1 cmt. n.5, and in the light of Wrenn's freely offered statements revealing a lack of remorse, we are not left with the definite and firm conviction that a mistake has been committed in denying him the reduction. *See Stanley*, 739 F.3d at 652, 655.

Wrenn's sentence is also substantively reasonable. The district court considered the statutory sentencing factors, 18 U.S.C. § 3553(a), and determined that a sentence of 120 months of imprisonment accounted for his background and provided adequate punishment. The selection of a sentence less than the statutory maximum of 20 years of imprisonment and within the guideline range suggests that the sentence is reasonable. *See United States v. Croteau*, 819 F.3d 1293, 1310 (11th Cir. 2016); *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008). Wrenn argues that the district court relied too heavily on his likelihood to reoffend and too little on his health issues. But "[t]he weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court." *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016). In the light of Wrenn's refusal to express remorse or assure the district court that

he would not reoffend, it was reasonable for the district court to consider the need for deterrence more heavily than Wrenn's desire for mercy. *See id.* The district court did not abuse its discretion.

## IV. CONCLUSION

We **AFFIRM** Wrenn's conviction and sentence.